[Crim. Nos. 8060, 8061. Second Dist., Div. Four. Oct. 16, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. RUTH BAWDEN, Defendant and Appellant.

(Two Cases.)

*Assigned by Chairman of Judicial Council.

Russell E. Parsons and Edward I. Gritz for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and George W. Kell, Deputy Attorney General, for Plaintiff and Respondent.

JEFFERSON, J.—The grand jury returned an indictment charging defendant in Counts VI and XIII with abortion in violation of section 274 of the Penal Code, and with con-

spiracy, with several codefendants, to commit abortions, in violation of section 182, subdivision 1, of the Penal Code. As to the conspiracy, 12 overt acts were charged. A prior conviction of abortion and one of conspiracy to commit abortion were alleged against defendant. The indictment charged codefendants with similar offenses all of which were disposed of by pleas and without a trial.

Defendant made a motion pursuant to section 995 of the Penal Code which was denied. A plea of not guilty was entered and the matter was set for trial. Trial was by court, trial by jury having been duly waived. The cause, pursuant to stipulation of defendant and all counsel, was submitted to the court on the testimony contained in the transcript of the proceedings had before the grand jury, with both sides reserving the right to present further testimony. Additional testimony was offered, and defendant testified in her own behalf. Defendant was found guilty as charged; the prior convictions were found to be true as alleged; probation was denied; and defendant was sentenced to state prison for the term prescribed by law on each of the counts charged against her with the terms to run concurrently.

The court made a finding that defendant was in violation of probation. Probation was revoked, and defendant was sentenced to state prison for the term prescribed by law on each of two counts, one of abortion and the other of conspiracy to commit abortion, to run concurrently with each other and concurrently with the sentences in the other case.

Defendant prosecutes this appeal from her conviction, the order denying motion for new trial, the order revoking probation and the judgment pronounced therein.

A summary of the evidence pertinent to the contentions of defendant on this appeal reveals that one Dorothy Jean Faulkner, believing herself to be pregnant, on or about December 15, 1959, discussed her condition with Allan Margolis and asked him to arrange for some help. She testified that on January 5, 1960, she received a telephone call from a woman who identified herself as ''Ruth.'' The woman calling over the telephone commented to her, ''You have a problem,'' and she told her that someone else would call. Later another woman telephoned her and identified herself as ''Edith,'' the doctor's nurse, and she told her that the price of an abortion would be $450. On January 6, 1960, she went to the Seaside Hospital where she met Edith who escorted her to a yacht at an anchorage. Codefendant Greenhill (not appealing here), and a man

called Danny also boarded the yacht, and after they put out to sea, Greenhill performed an abortion on her. During the return trip she gave Danny $400 in currency.

Allan Margolis was granted immunity from prosecution by the court and was ordered to testify. He stated that in the latter part of December 1959 he discussed Miss Faulkner's pregnancy with her and agreed to arrange an abortion for her. He had previously gone to defendant, Ruth Bawden, to arrange for an abortion on another girl which had been performed at defendant's home. He called defendant at the same number he had called previously, CLinton 5-6749, and he recognize the answering voice as that of defendant. He told her that he wanted to proceed with an abortion for Miss Faulkner and they made arrangements to set up a date for it. He learned later that the arrangement had not gone through, and in the meantime Miss Faulkner arranged for the abortion herself. He testified that he had provided the $450 paid by Miss Faulkner for her abortion.

Valerie Chaille testified after an order of the court granting her immunity from prosecution. She related that in the early part of January 1960 believing herself to be pregnant she discussed the matter with her mother and decided to terminate the pregnancy. On January 22, 1960, she went to a parking lot with her mother where they met "Edith" who escorted them to a yacht anchored at Long Beach. Danny Dyer was the operator of the boat, and the abortion was performed by Greenhill aboard the yacht.

Marian Springer, Valerie Chaille's mother, testified after an order of the court granting her immunity from prosecution. She stated that after learning of Valerie's pregnancy and agreeing to help her, she got in touch with a Virginia Vance who gave her a telephone number at which she could contact defendant, Ruth Bawden. She called a number, which she recalled followed a CLinton prefix, and discussed with defendant the pregnancy and the possibility of an abortion. Later she received a call from a man who identified himself as a doctor; and subsequently, after a call from "Edith" during which arrangements were agreed upon including the fee of $450, she received a further call from the doctor in which he agreed to go ahead with the abortion under the arrangements Edith had made. She and her daughter met Edith who took them aboard a yacht which was operated by Danny Dyer to whom she paid the fee of $450.

Virginia Vance, the wife of Valerie Chaille's father, testified

after an order of the court granting her immunity from prosecution. She stated that in January of 1960 Marian Springer called her and informed her that they had decided to terminate Valerie's pregnancy. Mrs. Vance agreed to help and gave Mrs. Springer a CLinton telephone number where she could contact "Ruth." Mrs. Vance had obtained this telephone number at the time of a previous abortion in which she had participated. She identified a piece of paper bearing the telephone number CLinton 5-6749 and the name of Ruth Bawden as the one she received in connection with the previous abortion.

Leon Greenhill previously entered a plea of guilty and was ordered to testify at the trial. He stated that he received information that Miss Faulkner desired an abortion from defendant Ruth Bawden, whom he had known for about four or five years. Defendant gave him the telephone number and asked him to contact Miss Faulkner. On January 6, 1960, he performed an abortion upon Miss Faulkner aboard the yacht "Westerly." He also received information concerning Valerie Chaille from defendant who gave him the name and telephone number of Valerie's mother whom he contacted in order to make arrangements for the abortion upon her daughter. He paid one half of the net receipts from these two abortions to defendant. He estimated that defendant had referred about 20 abortions to him during the period between December 15, 1958, and the date of the arrest.

The yacht "Westerly," located at the anchorage at Long Beach, had been under surveillance by police officers for approximately two months prior to defendant's arrest. The police officers had observed and photographed a number of persons who entered the yacht, and among these persons were Dorothy Faulkner and codefendants Leon Greenhill, Edith Dyer and Danny Dyer. Police Officer Fred Mitchell testified that after the arrest of Edith and Danny Dyer, he questioned Edith Dyer en route to the police administration building. She told him that she became involved in this enterprise after having obtained an abortion for her sister through defendant Bawden about one year prior to the date of this arrest. Following the abortion on her sister, the Dyers agreed to assist by picking up women and bringing them to the place where the abortions were to be performed. The Dyers had purchased the yacht "Westerly" upon which the abortions had been performed about eight months prior to the date of arrest. Mrs. Dyer told the police officers that defendant Bawden was

at the head of this operation. Officer Mitchell testified, "I related this information to my lieutenant upon arriving at the Police Building, and he immediately ordered Sergeant Le Page and Hille to go to the residence of Mrs. Bawden and to place her under arrest." Prior to this order of arrest, the officers had checked the records of the telephone company which indicated that defendant had been in communication with the yacht anchorage where the abortions were being performed. Defendant and codefendant Greenhill had previously been convicted together for performing abortions, and both of them were presently on probation.

It was stipulated that there was no warrant for arrest of defendant nor a search warrant. The two police officers went to defendant's home, were admitted and placed her under arrest. They searched the house and seized a telephone directory, a personal address book and a few slips of paper which they believed to have evidentiary value. The items taken from defendant's home were entered into evidence as exhibits. There was a partial erasure of the telephone number of the yacht anchorage which had been written in the telephone book. A qualified expert testified that in his opinion the name of one of the abortees, Jean Faulkner, on one of the exhibits was written by defendant.

Defendant testified in her own behalf. She denied that she had participated in or received any profits from any of the abortions. She admitted receiving money from codefendant Greenhill's wife, but stated this was the return on a $350 loan she had made to Mrs. Greenhill to have her little girl's teeth straightened. She admitted talking on the telephone to Valerie Chaille's mother who she said only asked, "Is this the right number for Dr. Greenhill?" She also admitted the telephone conversation with Margolis but stated that he merely called her to confirm the accuracy of Dr. Greenhill's number. She admitted writing the telephone number of the anchorage which had been written in the telephone book but stated she had never called that number. An employee of the telephone company testified that the number formerly listed to defendant was CLinton 5-6749 and that her present number is CLinton 5-7913.

In order to sustain a conviction of the crime of abortion the testimony of the woman upon whom the abortion has been performed and the testimony of accomplices must be corroborated by other evidence. (Pen. Code, § 1108.) Defendant

contends that there was not sufficient corroboration of the abortees' and accomplices' testimony in this case.

■ "Corroboration is sufficient if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the woman is telling the truth. [Footnote and Citations.] ■ It has been held that the corroborative evidence need not by itself establish that the crime was committed or show all the elements thereof, but it must relate to some act or fact which is an element of the offense. [Citations.] ■ It must create more than a suspicion, but it may be sufficient even though slight and entitled to but little consideration when standing by itself. [Citations.]

■ "A woman who has submitted to an abortion is not an accomplice of the persons charged with procuring or conspiring to procure the miscarriage. [Citations.] ■ ■ The testimony of any one of the [abortees] can be corroborated by that of a witness who was an accomplice, . . . and the testimony of the accomplice can be corroborated by that of any one of the [abortees]. [Citations.]'' (*People* v. *Gallardo,* 41 Cal.2d 57, 62 [257 P.2d 29].)

■ While we have heretofore summarized the testimony adduced at the trial, testimony of one of the abortees, Dorothy Faulkner, is corroborated by the testimony of codefendant Greenhill in that he received Miss Faulkner's name and telephone number from defendant Bawden, and he gave one-half of the net profits from that abortion to defendant. There was further corroboration by the testimony of Allan Margolis. Police officer Fred Mitchell testified he saw Miss Faulkner and photographed her as she went on board the yacht "Westerly" for her abortion. There was a slip of paper taken from defendant's home which had the name of Jean Faulkner written in the handwriting of defendant. The testimony of the other abortee, Valerie Chaille, was corroborated by the testimony of her mother and stepmother.

Defendant next contends the evidence was not sufficient to establish any of the counts of which defendant-appellant stands convicted. ■ Concerning the conspiracy charge, "Direct evidence is not required to establish a conspiracy, but circumstantial evidence may be relied upon. ■ This rule is sanctioned for the obvious reason that experience has demonstrated that as a general proposition a conspiracy can only be established by circumstantial evidence. ' ". . . it is not often that the direct fact of an unlawful design which is

the essence of a conspiracy can be proved otherwise than by the establishment of independent facts, bearing more or less closely or remotely upon the common design [citation]; and it is not necessary to show that the parties met and actually agreed to undertake the performance of the unlawful acts (citing authority), nor that they had previously arranged a detailed plan . . . for the execution of the conspiracy (citing authority)." [Citation.]' " (*People* v. *Massey,* 151 Cal. App.2d 623, 651 [312 P.2d 365].)

Without a further review of the facts it is obvious that the finding of a conspiracy to commit abortion and the abortion as well as defendant's participation therein are supported by substantial evidence which was considered by the trier of fact.

Defendant's final contention is that the search of defendant's home and the seizure of the telephone book and memorandum and the use thereof in the trial violated both the Fourteenth Amendment of the Constitution of the United States and article I, section 19, of the California Constitution, in that the search was made without a search warrant and not incident to a valid arrest.

"Penal Code section 836 states: 'A peace officer may make an arrest . . . without a warrant . . . 3. Whenever he has reasonable cause to believe that the person to be arrested has committed a felony whether or not a felony has in fact been committed.' Reasonable cause is such a state of facts as would lead a man of ordinary care and prudence to believe, or entertain an honest, strong suspicion, that the person in question is guilty of a crime. In considering the question of reasonable cause for the officer to act, the court looks only to the facts and circumstances presented to the officer at the time he was required to act. (*People* v. *Ingle,* 53 Cal.2d 407, 412, 414 [2 Cal.Rptr. 14, 348 P.2d 577].)" (*People* v. *Luckman,* 198 Cal.App.2d 347, 352 [18 Cal.Rptr. 167].)

 However, the legality of an arrest does not determine the lawfulness of a search incident thereto. (*People* v. *Brown,* 45 Cal.2d 640, 643 [290 P.2d 528].) "[T]he reasonableness of a search is not to be justified by what the search turns up 'but by appearances to the searcher at the time of his action.' So long as the officer reasonably evaluates these appearances and acts accordingly the rights of the accused are adequately safeguarded." (*People* v. *Sanson,* 156 Cal.App.2d 250, 254 [319 P.2d 422].)

 The evidence, as we have stated before, shows that there was probable cause to believe defendant guilty of the

crimes as charged in the indictment. The officers in making this arrest had received information concerning this defendant's involvement in the illegal activity. They knew of her prior conviction of a conspiracy to commit abortions with the same parties now under suspicion. They had checked her telephone number which was the same as had been used for contacts by persons seeking abortions.

Defendant in appealing from the order revoking probation contends that in the event the appeal from the judgment of conviction were to be reversed the judgment revoking probation would also have to be reversed. ▆ This does not follow, because often circumstances not warranting conviction may fully justify a court in revoking probation on a prior offense.

"In section 1203 of the Penal Code (1203.2 as amended) it is provided that the court is authorized to revoke an order for probation if there is reason to believe from the report of the probation officer or otherwise that the defendant had violated the terms of his probation. ▆ The discretion of the court to revoke an order of probation is 'very broad.' [Citation.] No formal procedure is provided for presenting charges of violation of probation. ▆ The court may make an order revoking probation based upon facts presented in an informal charge from which the court has reason to believe that the defendant has violated his probation or is unfit to be at large. [Citation.]" (*People* v. *Silverman*, 33 Cal.App.2d 1, 5 [92 P.2d 507].)

The judgment of conviction, orders denying motion for a new trial and revoking probation and judgment pronounced thereon are affirmed.

Burke, P. J., and Ford, J.,* concurred.

A petition for a rehearing was denied November 1, 1962, and appellant's petition for a hearing by the Supreme Court was denied December 12, 1962.

---

*Assigned by Chairman of Judicial Council.