[No. B236180. Second Dist., Div. One. Jan. 16, 2013.]

REBECCA A. RICKLEY et al., Plaintiffs and Respondents, v.
MARVIN GOODFRIEND, Individually and as Trustee, etc., et al.,
Defendants and Appellants.

COUNSEL

Gibbs, Giden, Locher, Turner & Senet, Michael B. Geibel and James I. Montgomery, Jr., for Defendants and Appellants Marvin Goodfriend and Tina Fasbender Goodfriend.

Waxler ♦ Carner ♦ Brodsky, Andrew J. Waxler and Danielle R. Sokol for Defendants and Appellants Procter Slaughter & Reagan, James N. Procter and Daniel R. Stevens.

Natasha Roit, in pro. per.; Law Offices of Natasha Roit and Natasha Roit for Plaintiff and Respondent Rebecca Rickley.

OPINION

**MALLANO, P. J.**—In this dispute between next-door neighbors, plaintiffs prevailed in a prior action, establishing that their neighbor had unlawfully dumped contaminated debris on their property. Judgment was entered for plaintiffs. The judgment required the neighbor to remove the debris pursuant to a court-approved remediation plan. The funds for the remediation plan were placed in the trust account of the neighbor's attorneys. The neighbor failed to remove the contaminated debris, and the attorneys disbursed the funds in a manner contrary to plaintiffs' interest in remediating the debris on their property. Plaintiffs then filed this action, alleging that the neighbor and his wife had not complied with the prior judgment, resulting in a continuing nuisance.

After filing the original complaint in this case, plaintiffs sought to add causes of action for civil conspiracy against the neighbors' attorneys on the ground the attorneys had conspired with their clients, the neighbor-defendants, to interfere with the court-approved remediation plan and to disburse the funds from the trust account so as to avoid remediating the contaminated debris on plaintiffs' property. The trial court allowed the amendment.

The attorney-defendants and the neighbor-defendants appeal from the trial court's order. We conclude the trial court did not abuse its discretion in allowing the amendment because the amended complaint alleges that attorney-defendants violated two independent legal duties owed to plaintiffs: (1) a duty not to engage in affirmative misconduct that would interfere with the remediation of the contaminated debris, and (2) a duty to disburse the funds from their trust account in a fair manner. Further, the claims against the attorney-defendants are not barred by the litigation privilege because, as alleged, the attorneys' communications and affirmative misconduct interfered with the abatement of a nuisance, involved communications with nonpartici-pants in the action, and did not attempt to achieve the objects of any litigation. (See Civ. Code, § 47, subd. (b); undesignated section references are to that code.) Rather, the attorney-defendants actively sought to thwart the remediation effort, causing a continuing nuisance on plaintiffs' property. Finally, the assertion of the conspiracy claims does not violate the attorney-client privilege given that the theory of liability as to the attorney-defendants is based on nonconfidential communications with third parties and nonconfidential conduct involving third parties.

# I

## BACKGROUND

This appeal involves one of three lawsuits plaintiffs have filed against defendants. The facts and allegations in this appeal are taken from the motion to amend the complaint, the proposed amended complaint, and the exhibits attached to the motion.

"In the construction of a pleading, for the purpose of determining its effect, its allegations must be liberally construed, with a view to substantial justice between the parties." (Code Civ. Proc., § 452.) Described as a "cornerstone jurisprudential polic[y], . . . complaints are to be liberally construed . . . and disputes should be resolved on their merits." (*CLD Construction, Inc. v. City of San Ramon* (2004) 120 Cal.App.4th 1141, 1149 [16 Cal.Rptr.3d 555].) "A fact may appear by inference as well as by direct allegation." (*United B. & T. Co. v. Fidelity & Deposit Co.* (1928) 204 Cal. 460, 465 [268 P. 907].)

"Consistent with the applicable rules of pleading, we adopt a liberal construction of plaintiffs' [proposed] amended complaint, drawing all reasonable inferences in favor of their allegations." (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1170, fn. 16 [278 Cal.Rptr. 614, 805 P.2d 873].) The proposed amended complaint, as construed in light of the exhibits filed in support of the motion to amend, should be "fairly read." (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 43 [77 Cal.Rptr.2d 709, 960 P.2d 513]; see *id.* at p. 48; *Buller v. Sutter Health* (2008) 160 Cal.App.4th 981, 987 [74 Cal.Rptr.3d 47]; *Paul v. Friedman* (2002) 95 Cal.App.4th 853, 866 [117 Cal.Rptr.2d 82].) Defendants do not contend that a different standard of construction should be applied in attorney-client conspiracy cases.

Plaintiffs, Rebecca A. Rickley and Natasha Roit, are residents and co-owners of property located on Malibu Vista Drive, Malibu, California. Their next-door neighbors, Marvin Goodfriend and Tina Fasbender Goodfriend, live on the same street.

The Goodfriends decided to remodel their home. During the remodeling, Marvin Goodfriend told the construction workers where to dump any debris. The debris was dumped on the Goodfriends' property *and* plaintiffs' property. As a result, the soil on both properties became contaminated with asbestos and lead. Plaintiffs repeatedly asked the Goodfriends to remove the debris from their property during the following year. The Goodfriends declined to do so. Plaintiffs resorted to litigation.

On May 17, 2004, plaintiffs filed an action against the Goodfriends in Los Angeles County Superior Court, alleging causes of action for nuisance, violation of covenants, conditions, and restrictions (CC&R's), trespass, and negligence per se based on (1) the Goodfriends' dumping contaminated debris on plaintiffs' property and (2) the Goodfriends' refusal to remediate it (*Rickley v. Goodfriend* (Super. Ct. L.A. County, 2006, No. SC081696)). The parties engaged in discovery. At his deposition, Marvin Goodfriend was asked, "So without a court order for you to remove the construction debris, you would not voluntarily do that?" He answered, "Correct." The case was tried to the court, Judge Cesar C. Sarmiento presiding. By judgment entered on February 23, 2006, Judge Sarmiento found defendant Marvin Goodfriend liable on all causes of action. Defendant Tina Fasbender Goodfriend was exonerated. "The Court ordered [Marvin Goodfriend] to abate the nuisance . . . and to obtain and pay for all necessary permits and approvals from any applicable government entities . . . ." The judgment recited that Mr. Goodfriend was to "abate the continuing nuisance in accordance with [the] remediation plan [of plaintiffs' expert witness] . . . . [¶] . . . [¶] . . . The remediation is to include the removal of the construction debris . . . placed on Plaintiffs' property. [¶] Goodfriend is ordered to comply with all laws

including those Los Angeles County Codes that apply to height restrictions on fences, walls, trees, shrubs, flowers and plants." The trial court appointed plaintiffs' expert witness, Steven Viani, to supervise the remediation plan. (We sometimes refer to the May 17, 2004 action as the first action and the resulting judgment as the first judgment.)

The trial court tentatively decided to award plaintiffs the funds needed to remediate the contaminated debris on their property. Marvin Goodfriend objected, arguing that instead of giving plaintiffs the funds to remediate the debris on their property only, the trial court should adopt a single plan to remediate the debris on plaintiffs' property *and* the Goodfriends' property. The trial court agreed and calculated a "budget" to remediate both properties at a cost of $230,000. Marvin Goodfriend was responsible for paying that amount. The remediation funds he paid were placed in the trust account of his attorneys. On March 3, 2006, without plaintiffs' knowledge, the Goodfriends' attorneys began disbursing the money from their trust account. The attorneys disbursed more than $115,000 of the funds. Under the remediation plan, the funds were to be spent to remediate *both* properties, but a fair share of the $115,000, if any, did not go toward remediating plaintiffs' property. Had it been otherwise, plaintiffs would have noticed the partial remediation of their property and known about the disbursement. Disputes arose between plaintiffs and the Goodfriends' attorneys as to the manner of disbursement.

At his deposition, one of the Goodfriends' attorneys testified that his firm maintained a ledger showing the disbursements of the remediation funds from the trust account, but he had never compared the ledger with the court-approved budget to determine whether the disbursements complied with the remediation plan.

On June 28, 2010, plaintiffs filed the present action against the Goodfriends, individually and as trustees of the Goodfriend Family Trust (collectively Goodfriends), alleging causes of action for (1) intentional *continuing* maintenance of trespass, (2) intentional *continuing* maintenance of private nuisance, and (3) intentional violation of the California Coastal Act of 1976 (Coastal Act) (Pub. Resources Code, §§ 30000–30900). The complaint alleges that the Goodfriends had failed to remediate the contaminated debris on plaintiffs' property—in violation of the first judgment—and that the Goodfriends had "willfully and intentionally dumped *more* debris, trash, and/or fill on [their own property]," creating a new dumpsite and nuisance. (Italics added.) With respect to the Coastal Act, plaintiffs allege that defendants had violated a coastal development permit by failing to place contaminated debris in an appropriate disposal site.

The Goodfriends responded with a demurrer, which was overruled on January 25, 2011. They filed an answer on February 14, 2011.

On July 27, 2011, plaintiffs filed a motion to amend the complaint, seeking to add causes of action for civil conspiracy against the Goodfriends' two attorneys, James Procter and Daniel Stevens, and their law firm, Procter, Slaughter & Reagan. (See § 1714.10.) The proposed amended complaint alleges as follows.

The trial court ordered the attorneys in the case not to send e-mails or letters to the contractors performing the remediation work unless the trial court or opposing counsel had first approved the contents of the communication. Attorney Procter refused to comply with the order. As a result, the trial court sent two e-mails to Procter, directing him to comply with the prior order. One of the e-mails, dated February 3, 2010, also informed Procter that he had violated a court order not to disclose which party was paying for the remediation work. The other e-mail, dated February 18, 2010, admonished Procter not to delete or add material to an e-mail *after* it had been approved but before it was sent. Procter ignored the order and continued to send unapproved e-mails to the contractors. On April 30, 2010, the trial court found him in contempt for sending unapproved e-mails and fined him $500.

On November 5, 2010, the South Coast Air Quality Management District (AQMD) issued a "Notice To Comply." According to the motion to amend, the notice stated: "Prior to any more construction, renovation or soil remediation, do the following: [¶] A) provide [the] date and location [of] any and all construction debris [that] was disposed on . . . the . . . property; [¶] B) if from structure, provide [a] copy of facility survey; [¶] C) provide name of contractor who performed the construction activity; [and] [¶] D) provide complete asbestos inspection sampling of site."

At some point, the trial court ordered the Goodfriends not to dig in the contaminated soil when removing an oleander tree. On November 9, 2010, the Goodfriends' other attorney, Daniel Stevens, violated the trial court's order and the AQMD notice. As alleged, "Attorney Stevens personally supervised, directed, and himself performed work in the area referenced by the court order and [the] AQMD." While the oleander was being removed, plaintiffs' counsel, Natasha Roit, contacted the clerk of court and advised him of Stevens's conduct. The trial court, Judge Sarmiento presiding, held three telephone conference calls with Stevens, Roit, and plaintiff Rickley. During all three calls, the trial court ordered Stevens to cease and desist from disturbing the soil. During the third conference call, Judge Sarmiento questioned Stevens:

"The Court: . . . Are you digging in the soil by the oleander tree?

"Ms. Roit: That's exactly what they were doing, your Honor.

"The Court: I just got off the phone with Judge Tarle. His order to you was that he was permitting you to cut the oleander down to the soil, but there was no digging up of the soil.

"Mr. Stevens: That is not correct, your Honor.

"The Court: I'll tell you, I just got off the phone with Judge Tarle, and that's what he told me. [¶] I can tell you right now, Mr. Stevens, the order I made previously about cutting down that oleander is in full force and effect. I can tell you, I just got off the phone with Judge Tarle, and he told me his order was that you are not to break the soil. You can cut down to the soil, but you could not dig up or do any digging around the oleander. Now, that's the order. [¶] And I'm telling you right now, Mr. Stevens, if you are digging in that soil, you are to cease and desist immediately.

"Mr. Stevens: My understanding from Tarle—I know you just spoke to him—was that we were allowed to dig holes and put up a fence.

"The Court: I just told you what I told you, Mr. Stevens. I told you what Judge Tarle just told me. You're coming in tomorrow at nine o'clock. I'm . . . going to order you right now no digging by the oleander.

"Mr. Stevens: Will you be there tomorrow, your Honor?

"The Court: Yeah, I'm at work tomorrow. But I'll . . . talk to Judge Tarle tomorrow morning as well.

"Mr. Stevens: Because it seems like there should be some more cross-discussion between the two of you to get the order sorted out.

"The Court: That's exactly right. That's one of the things I just discussed with Judge Tarle. We'll discuss that tomorrow morning. But I don't think there's any issue that you should be stopping and just get clarification. Don't create any more problems than there needs to be.

"Mr. Stevens: Noted, your Honor.

"[Plaintiff] Ms. Rickley: Does that mean stop or not stop?

"Ms. Roit: So, Mr. Stevens, are you stopping, sending your people out of [there]?

"Mr. Stevens: I'm not sure yet.

"Ms. Roit: Okay Judge. You got it, 'I'm not sure yet.' So it looks to me like they're going to continue.

"The Court: I've done what I can.

"Ms. Roit: So I appreciate the clarification. We're on the record, and we've contacted the sheriffs, and they're going to come out. I don't know what else to do because they're continuing to work.

"The Court: All right. See you tomorrow. Mr. Stevens, I'm ordering you to stop the work [and] comply with my order regarding the remediation around the oleander.

"Mr. Stevens: I hear that your Honor."

Notwithstanding the orders of Judge Sarmiento and Judge Norman P. Tarle, Stevens and the workers under his direction continued to dig in the soil for another hour—until a deputy sheriff arrived and instructed them to stop.

On April 11, 2011, the trial court issued an order to show cause (OSC) regarding contempt against Marvin Goodfriend and Attorney Stevens for "violating this Court's Orders on November 9, 2010," including Stevens's digging in the soil around the oleander. Also on April 11, 2011, the trial court issued an OSC regarding contempt against Marvin Goodfriend and Attorney Procter for "violating this Court's Orders pertaining to communications with third parties, ignoring this Court's remediation orders, and using the authority of this Court to misrepresent Court orders to government agencies." The hearing on the OSC's was set for April 28, 2011. (The proposed amended complaint does not indicate the outcome of the OSC's because the hearing was postponed until Nov. 1, 2011, after the hearing on the motion to amend.)

As alleged, at all relevant times, each defendant was the agent or employee of the remaining defendants and was at all times acting within the purpose and scope of his or her agency or employment, and "the Attorney Defendants, and each of them, formed and operated a conspiracy with their clients intended to, without limitation, thwart compliance with Plaintiffs' Judgment[] and postjudgment orders."

Meanwhile, on May 2, 2008, plaintiffs had filed another action against the Goodfriends, alleging the Goodfriends had erected a fence on plaintiffs' property (*Rickley v. Goodfriend* (Super. Ct. L.A. County, 2010, No. SC098072)). The Goodfriends refused to remove the fence even though their own surveyor confirmed that the fence was as many as 10 to 15 feet on plaintiffs' side of the property line. Plaintiffs sued the Goodfriends for

trespass, nuisance, and violation of the CC&R's. Judgment was entered in favor of plaintiffs. The Goodfriends refused to comply with the judgment. The trial court issued an OSC regarding contempt. "Two of the three contempt charges against [the] Goodfriends pertained to orders which were in the hands of Attorney Defendants to comply with . . . the filing of weekly status reports and providing Plaintiffs and the Court with documents—all pertaining to the Court's monitoring of the progress of the ordered remediation." On February 22, 2011, the day of the contempt trial, the court found the Goodfriends guilty on all three counts, imposed a fine of $3,000 on each of them, and sentenced Marvin Goodfriend to three days in jail.

According to the proposed amended complaint, Attorneys Procter and Stevens and their firm (collectively attorney-defendants), together with the Goodfriends, had engaged in a conspiracy (1) to interfere with the remediation plan, and (2) to disburse the remediation funds in an unfair manner, to plaintiffs' detriment. The conspiracy allegations were limited to the first three causes of action in the original complaint: intentional continuing maintenance of trespass, intentional continuing maintenance of private nuisance, and intentional violation of the Coastal Act. Plaintiffs also sought to add three new causes of action against the attorney-defendants only: breach of fiduciary duty, negligence, and accounting.

The Goodfriends and the attorney-defendants filed separate oppositions to the motion to amend the complaint.

The trial court, Judge Richard A. Stone, heard the motion on August 18, 2011. The court granted the motion, permitting the addition of the conspiracy allegations against the attorney-defendants on the first three causes of action and adding three new causes of action against the attorney-defendants only. The attorney-defendants and the Goodfriends filed separate appeals.

## II

## DISCUSSION

The attorney-defendants and the Goodfriends (collectively defendants) contend the trial court abused its discretion by allowing plaintiffs to add the attorney-defendants to the complaint on a conspiracy theory. Defendants also argue that the litigation privilege (§ 47, subd. (b)) barred the conspiracy

claims against the attorney-defendants. Last, defendants assert that the conspiracy allegations will require the disclosure of attorney-client communications if the attorney-defendants are to present an adequate defense.[1]

We conclude that none of defendants' contentions has merit. The conspiracy allegations against the attorney-defendants were properly added because the attorneys owed two independent legal duties to plaintiffs: (1) a duty not to interfere with the remediation plan—the removal of the contaminated debris—and (2) a duty to disburse the funds in the attorneys' trust account in a fair manner. (See § 1714.10, subd. (c)(1).) The litigation privilege (§ 47, subd. (b)) does not apply because the communications and affirmative misconduct of the attorney-defendants (1) had the intended effect of interfering with the abatement of a nuisance, (2) involved nonparticipants in the litigation, and (3) did not attempt to "achieve the objects of the litigation." (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1062 [39 Cal.Rptr.3d 516, 128 P.3d 713] (*Rusheen*).) On the contrary, the attorney-defendants actively sought to thwart the remediation effort, resulting in a continuing nuisance on plaintiffs' property. Finally, plaintiffs' conspiracy allegations do not violate the attorney-client privilege because the conspiracy claims are not based on any privileged communications but, instead, on communications with third parties—the contractors and employees hired to implement the remediation plan—and on nonconfidential conduct involving the same third parties.

A. *Conspiracy Claims Against Attorneys*

"Section 1714.10 was intended to weed out the harassing claim of conspiracy that is so lacking in *reasonable foundation* as to verge on the *frivolous*." (*Evans v. Pillsbury, Madison & Sutro* (1998) 65 Cal.App.4th 599, 604 [76 Cal.Rptr.2d 679], italics added; accord, *Central Concrete Supply Co., Inc. v. Bursak* (2010) 182 Cal.App.4th 1092, 1098–1099 [105 Cal.Rptr.3d 909].)

Section 1714.10, subdivision (a), states: "No cause of action against an attorney for a civil conspiracy with his or her client arising from any attempt to contest or compromise a claim or dispute, and which is based upon the attorney's representation of the client, shall be included in a complaint or other pleading unless the court enters an order allowing the pleading that includes the claim for civil conspiracy to be filed after the court determines

---

[1] Section 1714.10 governs the pleading of a civil conspiracy between an attorney and a client. The trial court's order granting the motion to add the attorney-defendants to the complaint as conspirators is made appealable by section 1714.10, subdivision (d). Thus, on appeal, the attorney-defendants can challenge the three conspiracy claims, but they cannot challenge that portion of the order permitting plaintiffs to add the three new causes of action (breach of fiduciary duty, negligence, and accounting).

that the party seeking to file the pleading has established that there is a reasonable probability that the party will prevail in the action. The court may allow the filing of a pleading claiming liability based upon such a civil conspiracy following the filing of a verified petition therefor accompanied by the proposed pleading and supporting affidavits stating the facts upon which the liability is based. The court shall order service of the petition upon the party against whom the action is proposed to be filed and permit that party to submit opposing affidavits prior to making its determination. . . ."

■ But section 1714.10, subdivision (a), does not apply to an amendment adding a conspiracy claim against an attorney if "(1) the attorney has an independent legal duty to the plaintiff, or (2) the attorney's acts go beyond the performance of a professional duty to serve the client and involve a conspiracy to violate a legal duty in furtherance of the attorney's financial gain." (§ 1714.10, subd. (c).) This appeal involves only the first exception: where an attorney owes an "independent legal duty" to the plaintiff. Put in simpler terms, "A conspiracy claim against an attorney is . . . proper if the attorney who conspires with a client to injure another violates his or her *own* duty to the plaintiff." (*Skarbrevik v. Cohen, England & Whitfield* (1991) 231 Cal.App.3d 692, 709–710 [282 Cal.Rptr. 627].)

"Section 1714.10 establishes special procedural requirements that must be satisfied before certain types of claims can be asserted against an attorney based on an alleged conspiracy between the attorney and his or her client. The statute as it currently reads is the product of legislative reaction to several appellate decisions. A brief review of its development is helpful to an understanding of the statute's limited scope and proper application in this case." (*Favila v. Katten Muchin Rosenman LLP* (2010) 188 Cal.App.4th 189, 207 [115 Cal.Rptr.3d 274], fns. omitted.)

"Section 1714.10 was originally enacted in 1988 in response to the Court of Appeal's decision in *Wolfrich Corp. v. United Services Automobile Assn.* (1983) 149 Cal.App.3d 1206 [197 Cal.Rptr. 446] (*Wolfrich*), which held, although an insurance company's attorneys could not be sued directly for violating Insurance Code section 790.03, they could be sued for conspiring with their client to commit unfair or deceptive acts or practices prohibited by the code. . . . To prevent the assertion of conspiracy claims against attorneys 'as a tactical ploy, particularly in actions against insurance companies' . . . , former section 1714.10 required a prefiling judicial determination of probable merit for any claim against an attorney alleging the attorney had conspired with his or her client. . . . Enacted as part of the same legislation . . . that created the special motion to strike for cases arising from constitutionally protected petitioning and speech activity (Code Civ. Proc., § 425.16), the

provisions were intended to ' "screen out meritless cases at an early stage" ' by requiring the plaintiff to demonstrate a probability of success on the merits. . . .

"In 1989, however, the Supreme Court in *Doctors' Co. v. Superior Court* (1989) 49 Cal.3d 39 [260 Cal.Rptr. 183, 775 P.2d 508] (*Doctors' Co.*) disapproved *Wolfrich*, holding no claim for conspiracy to violate the Insurance Code could be maintained against an attorney retained by an insurance company to assist in the defense of an insured against a third-party claim. . . . The court relied on the doctrine, commonly referred to as the 'agent's immunity rule,' that '[a] cause of action for civil conspiracy may not arise . . . if the alleged conspirator, though a participant in the agreement underlying the injury, was not personally bound by the duty violated by the wrongdoing and was acting only as the agent or employee of the party who did have that duty.' . . . The court held, '[b]ecause the noninsurer defendants are not subject to [the only statutory duty toward plaintiff claimed to have been breached] and were acting merely as agents of the insurer "and not as individuals for their individual advantage" . . . , "they cannot be held accountable on a theory of conspiracy." ' . . .

"The court explained, however, '[i]t remains true, of course, that under *other* sets of circumstances "[attorneys] may be liable for participation in tortious acts with their clients, and such liability may rest on a conspiracy" . . . . For example, an attorney who conspires to cause a client to violate a statutory duty peculiar to the client may be acting not only in the performance of a professional duty to serve the client but also in furtherance of the attorney's own financial gain.' . . . Additionally, a claim may lie 'against an attorney for conspiring with his or her client to cause injury by violating the attorney's own duty to the plaintiff.' . . .

"Following the decision in *Doctors' Co.*, the Legislature debated whether the need for section 1714.10 had been eliminated. . . . Ultimately, the statute was amended in 1991 to apply only to situations in which it was alleged an attorney had engaged in a conspiracy with his or her client 'arising from any attempt to contest or compromise a claim' . . . and to create, in a new subdivision (c), exceptions from the procedural requirements of section 1714.10 for the two situations described in *Doctors' Co.*: 'where (1) the attorney has an independent legal duty to the plaintiff, or (2) the attorney's acts go beyond the performance of a professional duty to serve the client and involve a conspiracy to violate a legal duty in furtherance of the attorney's financial gain.' . . . [¶] . . . [¶]

"The net effect of the agent's immunity rule as articulated in *Doctors' Co.*, *supra*, 49 Cal.3d 39, and the statutory exceptions to the section 1714.10

procedural requirements now contained in subdivision (c) is to render that section practically meaningless. If the plaintiff seeks to assert a conspiracy claim against an attorney based on the violation of a duty owed by the client, but not the attorney, and the attorney was acting within the scope of his or her professional responsibilities, the claim has no merit. The petition under section 1714.10 will be denied; but, in the absence of the statute, a demurrer would properly be sustained without leave to amend. Section 1714.10, at best, provides the attorney with only an additional procedural safeguard against meritless claims. If the plaintiff seeks to plead a conspiracy claim against an attorney based on fraud or virtually any other common law tort theory, the claim falls within section 1714.10, subdivision (c)(1); the procedural requirements of section 1714.10, subdivision (a), do not apply (that is, the plaintiff need not demonstrate a probability of prevailing on the merits); and the statute serves no screening function whatsoever." (*Favila v. Katten Muchin Rosenman LLP, supra*, 188 Cal.App.4th at pp. 208–210, citations & fns. omitted.)

■ Put another way, "the effect of the [1991 amendment to section 1714.10] is anomalous. Since[, by virtue of the addition of subdivision (c),] the statute now removes from its scope the two circumstances in which a valid attorney-client conspiracy claim may be asserted, its gatekeeping function applies only to attorney-client conspiracy claims that are not viable as a matter of law in any event. . . . Thus, a plaintiff who can plead a viable claim for conspiracy against an attorney need not follow the petition procedure outlined in the statute as such a claim necessarily falls within the stated exceptions to its application." (*Berg & Berg Enterprises, LLC v. Sherwood Partners, Inc.* (2005) 131 Cal.App.4th 802, 818 [32 Cal.Rptr.3d 325], citation omitted; accord, *Panoutsopoulos v. Chambliss* (2007) 157 Cal.App.4th 297, 304–305 [68 Cal.Rptr.3d 647]; *Pavicich v. Santucci* (2000) 85 Cal.App.4th 382, 390–396 [102 Cal.Rptr.2d 125].)

■ It is well established that an attorney has an independent legal duty to refrain from defrauding nonclients. For example, a conspiracy claim may be brought where a corporation and its attorney conspire to conceal from potential investors that other investors have threatened litigation against the venture. (See *Pavicich v. Santucci, supra*, 85 Cal.App.4th at pp. 397–398.) Similarly, a conspiracy claim is proper where an insurance company's coverage counsel misrepresents the policy limits to a party that has obtained a judgment against the company's insured. (See *Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone* (2003) 107 Cal.App.4th 54, 84–85 [131 Cal.Rptr.2d 777]; Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2012) ¶¶ 6:357 to 6:357.3, pp. 6-96 to 6-97 (rev. # 1, 2008, 2011).) And "where an 'attorney gives his client a written opinion with the intention that it be transmitted to and relied upon by [a third party] in dealing with the client[,] . . . the attorney owes the [third party] a duty of care

in providing the advice because [that party's] anticipated reliance upon [the opinion] is "the end aim of the transaction." ' " (*Pavicich v. Santucci, supra,* 85 Cal.App.4th at p. 395.)

An independent legal duty may also arise when an attorney engages in conduct that goes "way beyond the role of [a] legal representative." (*Burtscher v. Burtscher* (1994) 26 Cal.App.4th 720, 727 [31 Cal.Rptr.2d 682] (*Burtscher*).) In *Burtscher*, a husband and wife, Paul and Magdalena, respectively, agreed in writing that Magdalena would have unrestricted access to a home from January 1992 through January 1997. Attorney Linda Hobbs represented Paul in transferring ownership of the home from Magdalena to Paul and in negotiating a five-year lease for Magdalena. In January 1992, Magdalena moved into the home. Six months later, Paul and Magdalena were divorced. In June 1993, Hobbs recorded a quitclaim deed transferring ownership of the home from Paul to a corporation owned by Paul and his new wife, Nadja. Hobbs also represented the corporation and Nadja. In late June 1993, Hobbs and Nadja took repossession of the home while Magdalena was in Europe. More specifically, Hobbs called a locksmith and went to the home with Nadja. A guest was staying there and refused to let anyone inside. Hobbs then called her cousin, a deputy sheriff, to force the guest to leave. Meanwhile, the locksmith arrived and opened the door to the home. When the deputy sheriff arrived, he told the guest that Nadja had a deed, gave the guest two hours to vacate the premises, and threatened to arrest the guest if he refused to leave. The guest left, the locks were changed, and Hobbs contacted a storage company and arranged for Magdalena's belongings to be taken away.

In mid-July 1993, Magdalena filed suit against Paul, Nadja, and their corporation for ejectment, conversion, trespass, invasion of privacy, conspiracy, breach of contract, and bad faith denial of existence of contract. She requested injunctive relief to regain possession of the home. The trial court granted a temporary restraining order, finding Magdalena in possession of the property under color of right. The parties thereafter stipulated to a permanent injunction. In December 1993, Magdalena filed a motion to amend the complaint to add a cause of action against Attorney Hobbs and her law firm for civil conspiracy. The trial court granted the motion.

The defendants appealed from the order granting the motion to amend. The Court of Appeal affirmed the order, explaining: "The argument that Magdalena's declarations failed to provide evidentiary support for [Attorney] Hobbs's role in the affair cannot be taken seriously when Nadja herself declared the purpose of visiting the home was to retake possession, and Hobbs admitted going to the home with Nadja and being present throughout the encounter with the guest, sheriff and locksmith. . . . [A]t the argument in

the trial court, defense counsel conceded Hobbs was the one who made all the contacts[, saying]: '[Hobbs] acted as an attorney. She called a locksmith. She called the storage company. She accompanied her non-English speaking client on a trip to the property. She called the sheriff's department. These are all things attorneys do.' In short (and putting aside for the moment the conclusion that these are things lawyers normally do), it is the admissions and concessions of defendants and their counsel which establish the prima facie case." (*Burtscher, supra*, 26 Cal.App.4th at p. 726.)

The Court of Appeal continued: "[T]o the extent defendants argue [Attorney] Hobbs's acts are consistent with the normal services of an attorney, we disagree. This case arose out of a dispute over possession of a home given by contract to Magdalena for her 'unrestricted use' from January 1992 to January 1997. . . . [T]he evidence and concessions before the trial court showed, among other things, that in June 1993: Hobbs went to the home with the new wife who intended to take possession, Hobbs called the locksmith who opened the home while Hobbs waited for the deputy sheriff, Hobbs called her cousin, the deputy, who warned the guest Hobbs could have him arrested for trespass if he did not leave, and Hobbs contacted the storage company and had Magdalena's belongings taken away.

"We can perceive of situations where it may be difficult to distinguish between when a lawyer is representing a client and when he or she is an integral part of a conspiracy to defraud a third person, but that is not our case. In our case, attorney Hobbs resorted to self-help (with a little help from her cousin) in going onto the property and unilaterally retaking possession in circumstances where a lawyer would be serving a notice to quit, filing an unlawful detainer action and getting a court order. Hobbs actively participated in conduct that went way beyond the role of legal representative: self-help is not the practice of law." (*Burtscher, supra*, 26 Cal.App.4th at p. 727.)

Although *Burtscher* did not expressly state that Attorney Hobbs owed an independent legal duty to Magdalena, its analysis supports our conclusion. When an attorney "actively participate[s] in conduct that [goes] way beyond the role of legal representative" (*Burtscher, supra*, 26 Cal.App.4th at p. 727), he or she may be liable for wrongdoing to the same extent as a nonattorney. A license to practice law does not shield an attorney from liability when he or she engages in conduct that would be actionable if committed by a layperson. An attorney who commits such conduct may be liable under a conspiracy theory when the attorney agrees with his or her client to commit wrongful acts.

Under the amended complaint in *Burtscher*, Magdalena's claims against Paul, Nadja, their corporation, and Attorney Hobbs were based on the same

wrongful conduct: retaking possession of a home that, by contract between Magdalena and Paul, granted Magdalena the sole right of possession. Hobbs, acting as counsel for the other defendants, improperly evicted Magdalena by contacting a locksmith to open the locked door, calling a deputy sheriff to remove a guest from the premises, and having a storage company collect and store Magdalena's belongings. If Paul or Nadja had engaged in the same acts of self-help without the participation of Hobbs, they would have faced liability. That an attorney—Hobbs—committed the acts made no difference.

As *Burtscher* indicates, Attorney Hobbs owed Magdalena an independent legal duty not to evict her wrongfully. California law mandates compliance with certain statutory or common law procedures to retake possession of real property, such as (1) an action for unlawful detainer (see Friedman et al., Cal. Practice Guide: Landlord-Tenant (The Rutter Group 2012) ¶ 7:75, pp. 7-16.11 to 7-16.12 (rev. # 1, 2012)); (2) an action for forcible entry or forcible detainer (*id.*, ¶ 7:81, p. 7-19 (rev. # 1, 2004)); (3) a common law action for ejectment (*id.*, ¶ 7:83, p. 7-20 (rev. # 1, 2004)); or (4) a quiet title action (*id.*, ¶ 7:88, p. 7-20.2 (rev. # .1, 2004)). Because Hobbs did not follow any lawful procedure in retaking possession of the property but personally engaged in unlawful self-help, she could be found liable for conspiring with her clients to commit a wrongful eviction. (See *Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004, 1037–1042 [90 Cal.Rptr.3d 453].)

As explained in one treatise: "Attorneys are expected to stay within the bounds of law in representing their clients and advising about an appropriate course of action . . . . Counsel who circumvent established legal channels to accomplish a desired result, participating with the client in a scheme to dispossess the other spouse of his or her claimed property or possessory rights, are *not* performing the 'normal services of an attorney.' Conduct of this sort exposes counsel to a host of tort claims—including a cause of action for *attorney-client conspiracy*." (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2012) ¶ 1:444, pp. 1-119 to 1-120 (rev. # 1, 2012), original italics, citation omitted, citing *Burtscher, supra*, 26 Cal.App.4th at p. 727.)

■ We cannot overemphasize the statement by our Supreme Court: " 'The law imposes the obligation that *"every person* is bound . . . *to abstain from injuring the* person or *property of another*, or infringing upon *any of his rights*." ' " (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 515 [28 Cal.Rptr.2d 475, 869 P.2d 454], italics added (*Applied Equipment*); accord, *Younan v. Equifax Inc.* (1980) 111 Cal.App.3d 498, 511 [169 Cal.Rptr. 478]; see §§ 1708 ["Every person is bound, without contract, to abstain from injuring the . . . property of another . . . ."], 3520 ["No one

should suffer by the act of another."].) "Attorneys may be liable for participation in tortious acts with their clients, and such liability may rest on a conspiracy." (*Doctors' Co. v. Superior Court, supra,* 49 Cal.3d at p. 46; see *id.* at p. 47.)

So it is here. By interfering with the remediation of the contaminated debris on plaintiffs' property, Attorneys Procter and Stevens, as agents of their law firm, breached an independent legal duty " 'to abstain from injuring the . . . property of another.' " (*Applied Equipment, supra,* 7 Cal.4th at p. 515.) The trial court appointed plaintiffs' expert witness, Steven Viani, to direct the remediation work, but Procter and Stevens interjected themselves into the remediation process, interfered with the remediation plan, and contributed to the continuing nature of the nuisance.

Attorney Procter violated a court order by repeatedly contacting the contractors without obtaining the prior approval of the trial court or plaintiffs' counsel. For that violation, he was found in contempt and was fined $500 on April 30, 2010. Approximately a year later, on April 11, 2011, the trial court issued an OSC against him regarding contempt for "violating this Court's Orders pertaining to communications with third parties, ignoring this Court's remediation orders, and using the authority of this Court to misrepresent Court orders to government agencies." The importance of these facts is *not* that Procter was found in contempt or that he was the subject of an OSC regarding contempt. Rather, the facts show that Procter interfered with the cleanup effort by contacting the contractors through unapproved e-mails. Put another way, Procter engaged in affirmative misconduct that interfered with the remediation plan, causing the continuation of the nuisance. The Goodfriends had a duty to abate the nuisance by remediating the contaminated debris, but, as alleged, they decided to continue the nuisance with the active assistance of their attorneys.

Having represented the Goodfriends in the first action and lost, Procter should have left the remediation work to others, directed by an expert, specifically, plaintiffs' expert witness. That is what the judgment expressly contemplated. Instead, as a fair reading of the proposed amended complaint indicates, Procter contacted the contractors through unapproved e-mails and provided them with information or instructions of some kind that interfered with the remediation plan. He affirmatively contributed to the continuation of the nuisance even though his clients had a duty to abate it. That is not a "normal service[] of an attorney." (*Burtscher, supra,* 26 Cal.App.4th at p. 727.) When Procter interfered with the remediation effort by sending unapproved e-mails to the contractors, he breached an independent legal duty to plaintiffs not to interfere with the remediation of the contaminated debris.

Attorney Stevens went to the worksite, where he misdirected the work of a contractor's employees in the removal of an oleander tree. He, too, actively assisted the Goodfriends in continuing the nuisance. Stevens performed some of the work himself by digging in the contaminated soil. The trial court held three telephone conversations with Stevens, ordering him to cease and desist from disturbing the soil. Nevertheless, Stevens continued to misdirect the employees and to dig in the soil until a deputy sheriff arrived and instructed them to stop. Stevens was not rendering the "normal services of an attorney" (*Burtscher, supra*, 26 Cal.App.4th at p. 727) when he was misdirecting the remediation effort or digging in the soil. Stevens's conduct, like that of Procter, breached an independent legal duty not to interfere with the remediation of plaintiffs' property.

◼ Given the allegations that the *attorney-defendants* allegedly agreed with the Goodfriends to interfere with the remediation plan and the allegations that the *attorney-defendants* took affirmative steps to accomplish that goal, an attorney-client conspiracy has been properly alleged. As the Supreme Court observed in *Doctors' Co. v. Superior Court, supra*, 49 Cal.3d 39, the rule that employees and agents cannot be held liable for engaging in a conspiracy with their principal "to violate a duty that is *binding on the principal alone*, will be relatively narrow where the violated duty is *other than contractual*" (*id.* at p. 48, italics added). ◼ That observation aptly describes the attorneys' duty in this case: The duty to refrain from interfering with the remediation plan was not a contractual one but, instead, was a duty grounded in tort law and the statutory law of the Coastal Act. In sum, the attorney-defendants owed plaintiffs an independent legal duty not to prolong the nuisance by interfering with the remediation plan; they breached that duty; and the breach resulted in a continuing nuisance on plaintiffs' property.

◼ The attorney-defendants also owed plaintiffs an independent legal duty with respect to the funds held in the attorneys' trust account. At Marvin Goodfriend's request, the trial court in the first action did not award damages to plaintiffs but instead required Goodfriend to fund the remediation of *both* properties. The attorney-defendants voluntarily placed Goodfriend's money in their trust account, over which plaintiffs had no control. By holding the remediation funds for the benefit of *all* parties, the attorneys and their firm assumed a duty to disburse the money equitably—without favoritism to their clients or detriment to plaintiffs' interests. "A defendant who enters upon an affirmative course of conduct affecting the interests of another is regarded as assuming a duty to act, and will be liable for negligent acts or omissions . . . , because one who undertakes to do an act must do it with care. . . . 'Where performance clearly has begun, there is no doubt that there is a duty of care.'" (*Bloomberg v. Interinsurance Exchange* (1984) 162 Cal.App.3d 571, 575 [207 Cal.Rptr. 853], citations omitted; accord, *Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 613 [76 Cal.Rptr.2d 479, 957 P.2d 1313]; Rest.2d Torts,

§ 323, com. a, p. 136, followed in *Coffee v. McDonnell-Douglas Corp.* (1972) 8 Cal.3d 551, 557–558 & fn. 6 [105 Cal.Rptr. 358, 503 P.2d 1366].) Further, "[a]s officers of the court, attorneys enjoy both privileges and responsibilities, among which is the duty to deal honestly and fairly with adverse parties and counsel." (*Wasmann v. Seidenberg* (1988) 202 Cal.App.3d 752, 756 [248 Cal.Rptr. 744].) "[N]either party is permitted to secure an advantage to the prejudice of another and . . . the interest of one party will not be diminished in any degree to advance the interests of another." (*Elbert, Ltd. v. Federated etc. Properties* (1953) 120 Cal.App.2d 194, 206 [261 P.2d 743].) Yet, as alleged, the attorney-defendants disbursed the funds without plaintiffs' knowledge and did so in a manner that unfairly benefited the Goodfriends.

Consistent with the conspiracy claims alleged against the attorney-defendants, the Goodfriends were found in contempt for not providing plaintiffs and the trial court with weekly status reports on the progress of the remediation effort. The attorney-defendants knew about the trial court's order that the status reports be made. But if such reports had been made accurately, they would have revealed that the Goodfriends and the attorney-defendants were interfering with the remediation plan and disbursing the remediation funds unfairly.

We realize that, under the agent's immunity rule, "[a] cause of action for civil conspiracy may not arise . . . if the alleged conspirator, though a participant in the agreement underlying the injury, was *not personally bound by the duty violated by the wrongdoing* and was acting only as the agent or employee of the party who did have that duty." (*Doctors' Co. v. Superior Court, supra,* 49 Cal.3d at p. 44, italics added.) "[A]n attorney acting *only within the scope of his or her official duties* who is *not personally bound by the duty violated* may not be held liable for civil conspiracy even though he or she may have participated in the agreement underlying the injury." (*Berg & Berg Enterprises, LLC v. Sherwood Partners, Inc., supra,* 131 Cal.App.4th at p. 825, italics added.) Here, the attorney-defendants had a legal duty not to interfere with the remediation plan—the removal of the contaminated debris. They also had a legal duty to disburse the remediation funds from their trust account in a fair manner to remediate the properties of *all* parties.

The attorney-defendants argue that they cannot be added as conspirators to plaintiffs' cause of action alleging a violation of the Coastal Act because plaintiffs may recover only "statutory penalties" under the act. As stated in the Coastal Act, "Any person may maintain an action for the recovery of civil penalties [if another person violates a coastal development permit]." (Pub. Resources Code, § 30805; see *id.,* § 30820, subd. (a)(1).) Here, a coastal development permit required that the contaminated debris be placed in an appropriate disposal site. The proposed amended complaint alleges that,

contrary to the permit, the Goodfriends dumped a portion of the debris in residential trash cans. We see no reason why the attorney-defendants cannot be made parties to the Coastal Act claim in light of the allegation that they conspired with the Goodfriends to violate the act as part of a scheme to interfere with the abatement of the nuisance. Once a conspiracy was formed to continue the existing nuisance by interfering with the remediation plan, the attorney-defendants were liable not only for their own wrongdoing but also for the Goodfriends' disposal of the contaminated debris in an unlawful manner, which was done in furtherance of the conspiracy. (See *Doctors' Co. v. Superior Court, supra,* 49 Cal.3d at p. 44; *Applied Equipment, supra,* 7 Cal.4th at p. 511; *Favila v. Katten Muchin Rosenman LLP, supra,* 188 Cal.App.4th at p. 206.)

■ Defendants seem to argue that an action for conspiracy must be based exclusively on tort principles, not on a statutory violation that provides civil penalties. No authority is cited for that proposition, and we cannot conceive of a basis for limiting conspiracy claims in that manner. It is sufficient that a conspiracy is based on an agreement to engage in unlawful conduct regardless of whether the conspiracy violates a duty imposed by tort law or a statute. (See *Applied Equipment, supra,* 7 Cal.4th at p. 511; *Cellular Plus, Inc. v. Superior Court* (1993) 14 Cal.App.4th 1224, 1236–1238 [18 Cal.Rptr.2d 308].)

Thus, the amended complaint sufficiently alleges that Procter, Stevens, and their law firm owed plaintiffs independent legal duties not to interfere with the remediation plan and not to disburse the remediation funds unfairly. Given the allegations against the Goodfriends concerning their wrongdoing, the amended complaint adequately pleads a civil conspiracy between the attorney-defendants and the Goodfriends. Because the attorney-defendants owed plaintiffs independent legal duties, section 1714.10 does not apply, and plaintiffs did not have to satisfy the statute's procedural requirements in alleging the conspiracy claims against the Goodfriends' attorneys. (See § 1714.10, subd. (c); *Favila v. Katten Muchin Rosenman LLP, supra,* 188 Cal.App.4th at pp. 208–210; *Berg & Berg Enterprises, LLC v. Sherwood Partners, Inc., supra,* 131 Cal.App.4th at p. 818; *Panoutsopoulos v. Chambliss, supra,* 157 Cal.App.4th at pp. 304–305; *Pavicich v. Santucci, supra,* 85 Cal.App.4th at pp. 390–396; Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial, *supra,* ¶¶ 6:354 to 6:355.1, pp. 6-94.3 to 6-95 (rev. # 1, 2009, 2011).)

On a related subject, the Goodfriends argue the trial court abused its discretion under section 473, subdivision (a)(1), of the Code of Civil Procedure by granting the motion to amend the complaint. That section provides: "The court may, in furtherance of justice, and on any terms as may

be proper, allow a party to amend any pleading or proceeding by adding or striking out the name of any party, or by correcting a mistake in the name of a party, or a mistake in any other respect . . . . The court may likewise, in its discretion, after notice to the adverse party, allow, upon any terms as may be just, an amendment to any pleading or proceeding in other particulars . . . ." (*Ibid.*)

"Code of Civil Procedure section 473, which gives the courts power to permit amendments in furtherance of justice, has received a very liberal interpretation by the courts of this state. . . . In spite of this policy of liberality, a court may deny a good amendment in proper form where there is unwarranted delay in presenting it. . . . On the other hand, where there is no prejudice to the adverse party, it may be an abuse of discretion to deny leave to amend." (*Thompson Pacific Construction, Inc. v. City of Sunnyvale* (2007) 155 Cal.App.4th 525, 544–545 [66 Cal.Rptr.3d 175], citations omitted.) "In the furtherance of justice, trial courts may allow amendments to pleadings and if necessary, postpone trial. . . . Motions to amend are appropriately granted as late as the first day of trial . . . or even during trial . . . if the defendant is alerted to the charges by the factual allegations, no matter how framed . . . and the defendant will not be prejudiced." (*Honig v. Financial Corp. of America* (1992) 6 Cal.App.4th 960, 965 [7 Cal.Rptr.2d 922], citations omitted.)

Because the Goodfriends have failed to make an adequate showing of prejudice, the trial court did not abuse its discretion under Code of Civil Procedure section 473.

Finally, defendants incorrectly state that the conspiracy claims in the proposed amended complaint are based solely on "mere allegations." They suggest that any imaginative plaintiff can add an attorney-client conspiracy claim without supporting evidence. That may be true in conspiracy cases excluded from section 1714.10, namely, where the attorney has an independent legal duty to the plaintiff *or* the attorney's acts go beyond the performance of a professional duty to serve the client and involve a conspiracy to violate a legal duty in furtherance of the attorney's financial gain. (See, e.g., *Berg & Berg Enterprises, LLC v. Sherwood Partners, Inc., supra*, 131 Cal.App.4th at p. 818; § 1714.10, subd. (c).) Nevertheless, in moving to amend the complaint to add the attorney-defendants as conspirators, plaintiffs submitted (1) an excerpt from Marvin Goodfriend's deposition; (2) the judgment in the first action, adopting the remediation plan recommended by plaintiffs' expert witness and appointing the expert witness to supervise the remediation; (3) the April 11, 2011 OSC regarding contempt against the attorney-defendants; (4) two e-mails from the trial court to Attorney Procter, instructing him not to send e-mails to contractors without the prior approval

of plaintiffs; (5) the April 30, 2010 order finding Procter in contempt for sending unapproved e-mails to contractors; (6) the AQMD notice to comply; and (7) the reporter's transcript of the trial court's third telephone conversation with Attorney Stevens when he was at the worksite, misdirecting the contractors' employees in the removal of the oleander and participating in the disturbance of the contaminated soil, thereby interfering with the abatement of the nuisance.

## B. *Litigation Privilege*

"The litigation privilege is codified in Civil Code section 47 . . . : '[A] privileged publication or broadcast is one made . . . [i]n any . . . judicial proceeding . . . .' (§ 47, subd. (b).) The privilege recognized in section 47 derives from common law principles establishing a defense to the tort of defamation. . . .

 " 'Although originally enacted with reference to defamation . . . , the privilege is now held applicable to any communication, whether or not it amounts to a publication . . . , and all torts except malicious prosecution. . . . [I]t applies to any publication required or permitted by law in the course of a judicial proceeding *to achieve the objects of the litigation*, even though the publication is made outside the courtroom and no function of the court or its officers is involved. . . . [¶] The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) *to achieve the objects of the litigation*; and (4) that have some connection or logical relation to the action. . . .' . . . Thus, 'communications with "some relation" to judicial proceedings' are 'absolutely immune from tort liability' by the litigation privilege . . . . It is not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards. . . .

 "Because the litigation privilege protects only publications and communications, a 'threshold issue in determining the applicability' of the privilege is whether the defendant's conduct was communicative or noncommunicative. . . . The distinction between communicative and noncommunicative conduct hinges on the gravamen of the action. . . . That is, the key in determining whether the privilege applies is whether the injury allegedly resulted from an act that was communicative in its essential nature." (*Rusheen, supra*, 37 Cal.4th at pp. 1057–1058, citations omitted, italics added.)

In *Rusheen*, an attorney, Barry Cohen, submitted a declaration of service of process signed by a process server, who declared under penalty of perjury he had personally served the defendant, Terry Rusheen, with the summons and complaint. Based on the declaration, Cohen obtained a default judgment.

Cohen's client, using a different attorney, applied for a writ of execution and began levying on Rusheen's property in Nevada. (*Rusheen, supra,* 37 Cal.App.4th at pp. 1053–1054.) Rusheen moved to vacate the default judgment, denying he had been served with process. Cohen opposed the motion with declarations stating Rusheen had been properly served. The trial court denied the motion to vacate the default judgment. Rusheen appealed and prevailed. The Court of Appeal reversed the judgment and directed the trial court to grant Rusheen's motion to vacate the default judgment. (*Id.* at pp. 1054–1055.)

Not satisfied with the reversal of the default judgment, Rusheen filed a cross-complaint against Cohen for abuse of process, contending the declarations submitted by Cohen in response to Rusheen's motion to vacate the default judgment were based on perjury. Cohen brought a special motion to strike, contending that the cross-complaint was a strategic lawsuit against public participation (SLAPP) (Code Civ. Proc., § 425.16). In the anti-SLAPP motion, Cohen argued that Rusheen could not prevail on his cross-complaint because the abuse of process claim was barred by the litigation privilege (§ 47, subd. (b)). The trial court agreed and granted the motion. The Court of Appeal reversed, concluding that the filing of an allegedly perjured document fell within the scope of the litigation privilege but the alleged conspiracy to execute on the resulting default judgment was unprivileged, noncommunicative conduct. The Supreme Court granted review and reversed the Court of Appeal.

As the high court stated: "The Court of Appeal failed to identify any allegedly wrongful conduct by Cohen other than simply filing perjured declarations of service. Although the [Court of Appeal] stated that the conspiracy 'culminated in the noncommunicative conduct of enforcing the judgment,' enforcement of a judgment (in this case by way of levy) is simply the object of any civil action for damages. . . . [T]he [Court of Appeal] further stated (somewhat inconsistently) that the 'gravamen of the complaint here is that . . . Cohen and his coconspirators *obtained* a judgment by default by using false proofs of service' . . . , conduct that is manifestly communicative.

"On close analysis, the gravamen of the action was not the levying act, but the procurement of the judgment based on the use of allegedly perjured declarations of service. Because these declarations were communications '(1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) *to achieve the objects of the litigation*; and (4) that have some connection or logical relation to the action' . . . , the litigation privilege applies to the declarations and protects against torts arising from the privileged declarations. . . . [A]s Cohen argues, since a party may

not be liable for submitting false testimony or evidence in the course of judicial proceedings which are used to obtain a judgment, the party should likewise be immune from abuse of process claims for subsequent acts necessary to enforce it. Otherwise, application of the litigation privilege would be [undermined]. Thus, where the gravamen of the complaint is a privileged communication (i.e., allegedly perjured declarations of service) the privilege extends to *necessarily related* noncommunicative acts (i.e., act of levying).

"Extending the litigation privilege to postjudgment *enforcement* activities that are *necessarily related* to the allegedly wrongful communicative act is consistent with public policy considerations. The purposes of section 47, subdivision (b), are to afford litigants and witnesses free access to the courts without fear of being harassed subsequently by derivative tort actions, to encourage open channels of communication and zealous advocacy, to promote complete and truthful testimony, to give finality to judgments, and to avoid unending litigation . . . . To effectuate these purposes, the litigation privilege is absolute and applies regardless of malice. . . . Moreover, '[i]n furtherance of the public policy purposes it is designed to serve, the privilege prescribed by section 47(2) has been given broad application.' " (*Rusheen, supra,* 37 Cal.4th at pp. 1062–1063, citations omitted, some italics added.)

In contrast to *Rusheen,* the communications and affirmative misconduct of Attorneys Procter and Stevens had the intended effect of continuing a nuisance by interfering with a court-approved remediation plan, leaving contaminated debris on plaintiffs' property. The communication in *Rusheen* involved the filing of declarations with the court. As *Rusheen* explained: "The '[p]leadings and process in a case are generally viewed as privileged communications.' . . . The privilege has been applied specifically in the context of abuse of process claims alleging the filing of false or perjurious testimony or declarations. . . . Thus, the Court of Appeal here correctly concluded that the communicative act of filing an allegedly false declaration of service of process fell within the litigation privilege." (*Rusheen, supra,* 37 Cal.4th at p. 1058, citations omitted.)

*Rusheen* did not extend the litigation privilege to postjudgment communications or misconduct that contributes to a continuing tort, namely, interfering with a court-approved remediation plan to remove contaminated debris from a neighbor's property. Rather, *Rusheen* "[e]xtend[ed] the litigation privilege to postjudgment *enforcement* activities." (*Rusheen, supra,* 37 Cal.4th at p. 1063, italics added.) Here, if anything, the attorney-defendants engaged in postjudgment *obstructionist* activities by actively assisting their clients in thwarting the remediation plan. Unlike the defendant in *Rusheen,* the attorney-defendants in this case were *not* taking steps *to enforce* a judgment. Rather, they engaged in affirmative misconduct that contravened a judgment.

When Attorney Stevens was misdirecting the remediation of contaminated soil and personally digging in the soil near the oleander tree, when Attorney Procter was sending unapproved e-mails to the contractors, and when both of them were disbursing the remediation funds unfairly, their conduct was not "necessarily related" to a privileged communication. (*Rusheen, supra,* 37 Cal.4th at p. 1062 [where gravamen of complaint is a privileged communication, litigation privilege extends to necessarily related noncommunicative conduct].) According to the proposed amended complaint, the attorneys' conduct was undertaken as part of a scheme to continue the existing nuisance by interfering with the remediation plan. Procter and Stevens engaged in wrongful conduct of their own volition, not to implement a privileged communication.

In addition, the conspiracy claims in this action are based on communications the attorney-defendants had with third parties, namely, the contractors and the employees performing the remediation work. "[S]tatements to *nonparticipants* in the action are generally not privileged under section 47, subdivision (b), and are thus actionable unless privileged on some other basis." (*Rothman v. Jackson* (1996) 49 Cal.App.4th 1134, 1141 [57 Cal.Rptr.2d 284], italics added; see *Silberg v. Anderson* (1990) 50 Cal.3d 205, 219 [266 Cal.Rptr. 638, 786 P.2d 365].)

Nor can it be said that the communications made by the attorney-defendants in this case were an attempt " 'to achieve the objects of the litigation.' " (*Rusheen, supra,* 37 Cal.4th at p. 1057.) "A party's legitimate objectives *in* the litigation are limited to the remedies which can be awarded by courts. Thus, the 'objects of the litigation' for a plaintiff are to obtain a monetary recovery for damages or other relief; a defendant's 'objects' are to resist a determination of liability and whatever assessment of damages, penalty or other order that the plaintiff seeks." (*Rothman v. Jackson, supra,* 49 Cal.App.4th at pp. 1147–1148.)

Here, the litigation privilege offers no protection for the collaborative efforts of the parties and their attorneys to interfere with a court-approved remediation plan. The privilege does not bar a civil conspiracy claim against a defendant and his or her attorney when they jointly act to interfere with efforts to remove contaminated debris from a neighbor's property, resulting in a continuing nuisance. If the Goodfriends disagreed with the judgment in the first action or the trial court's postjudgment orders, the appropriate response was to seek relief by way of an appeal and a request for a stay or, if necessary, the posting of a bond. An appeal was the proper means " 'to achieve the objects of the litigation.' " (*Rusheen, supra,* 37 Cal.4th at p. 1057.) Instead, the Goodfriends and their attorneys allegedly agreed to thwart the cleanup of the debris and thereby continue the nuisance.

"The litigation privilege . . . serves broad goals of guaranteeing access to the judicial process, promoting the zealous representation by counsel of their clients, and reinforcing the traditional function of the trial as the engine for the determination of truth. Applying the litigation privilege to some forms of unlawful litigation-related activity may advance those broad goals notwithstanding the 'occasional unfair result' in an individual case. . . . [T]he litigation privilege applies to subornation of perjury because 'it is in the nature of a statutory privilege that it must deny a civil recovery for immediate wrongs—sometimes even serious and troubling ones—in order to accomplish what the Legislature perceives as a greater good.' " (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 324 [46 Cal.Rptr.3d 606, 139 P.3d 2], citation omitted.) In sum, " 'the purpose of the litigation privilege is to ensure free access to the courts, promote complete and truthful testimony, encourage zealous advocacy, give finality to judgments, and avoid unending litigation.' " (*Feldman v. 1100 Park Lane Associates* (2008) 160 Cal.App.4th 1467, 1496 [74 Cal.Rptr.3d 1].)

The goals of the litigation privilege would not be advanced by conferring immunity on the Goodfriends and their attorneys given that, together, they allegedly conspired to interfere with the abatement of a nuisance, resulting in a continuing nuisance on plaintiffs' property. Every conspiracy between a client and an attorney involves communications and conduct. (See Black's Law Dict. (9th ed. 2009) pp. 351–352; Webster's 3d New Internat. Dict. (2002 ed.) p. 485, col. 2.) To apply the litigation privilege in this case would be tantamount to eliminating civil conspiracy claims against attorneys. But implicit in section 1714.10, as originally enacted, is the Legislature's conclusion that *some* attorney-client conspiracy claims—those based on a "reasonable foundation"—may be properly maintained. (See *Central Concrete Supply Co., Inc. v. Bursak, supra,* 182 Cal.App.4th at pp. 1098–1099; *Evans v. Pillsbury, Madison & Sutro, supra,* 65 Cal.App.4th at p. 604.) We decline to apply the litigation privilege where to do so would, in essence, abolish a cause of action—an attorney-client conspiracy—which the Legislature has tacitly approved.

Simply put, the litigation privilege did not protect the attorney-defendants' communications or conduct, which interfered with the remediation plan and had the intended effect of continuing the nuisance. Nor did the attorney-defendants' communications with third parties or their conduct—such as digging in the soil and sending unapproved e-mails to contractors—attempt to achieve the objects of the litigation. Rather, the attorney-defendants actively assisted their clients in continuing a nuisance.

## C. *Attorney-client Privilege*

Defendants assert that permitting a conspiracy claim between the attorney-defendants and their clients, the Goodfriends, will somehow implicate or require the disclosure of communications protected by the attorney-client privilege. We disagree.

The attorney-client privilege " 'has been a hallmark of Anglo-American jurisprudence for almost 400 years. . . . The privilege authorizes a client to refuse to disclose, and to prevent others from disclosing, confidential communications between attorney and client. . . . Clearly, the fundamental purpose behind the privilege is to safeguard the confidential relationship between clients and their attorneys so as to promote full and open discussion of the facts and tactics surrounding individual legal matters. . . . In other words, the public policy fostered by the privilege seeks to insure "the right of every person to freely and fully confer and confide in one having knowledge of the law, and skilled in its practice, in order that the former may have adequate advice and a proper defense." ' " (*Solin v. O'Melveny & Myers* (2001) 89 Cal.App.4th 451, 456–457 [107 Cal.Rptr.2d 456], citations & fn. omitted.)

Notwithstanding the contention of the attorney-defendants, plaintiffs' conspiracy claims are not " 'incapable of complete resolution without breaching the attorney-client privilege.' " (*Solin v. O'Melveny & Myers, supra,* 89 Cal.App.4th at p. 467.) The conspiracy claims against the attorney-defendants are based on their nonconfidential communications with third parties—the contractors and their employees—as well as their nonconfidential conduct—such as digging in the soil and sending unapproved e-mails to contractors. None of those communications or acts falls within the scope of the attorney-client privilege. The proposed amended complaint alleges that the attorney-defendants interfered with the remediation plan and, as a result, delayed the removal of contaminated debris from plaintiffs' property. The determination of whether the attorney-defendants and the Goodfriends participated in a conspiracy to thwart the remediation effort and unfairly disburse the remediation funds can be resolved by the trier of fact without any evidence of statements between the attorneys and their clients.

Further, although a case may be dismissed on the ground that the attorney-client privilege prevents an attorney-defendant from presenting an adequate defense, the trial court must first conduct an evidentiary hearing to "determine whether it is able to effectively use 'ad hoc measures from [its] equitable arsenal,' including techniques such as 'sealing and protective orders, limited admissibility of evidence, orders restricting the use of testimony in successive proceedings, and, where appropriate, in camera proceedings,' so as to permit the action to proceed." (*Dietz v. Meisenheimer & Herron*

(2009) 177 Cal.App.4th 771, 793 [99 Cal.Rptr.3d 464]; see *id.* at pp. 781–784 [discussing evidentiary hearing].) "[A] court may take the *extraordinary step* of dismissing a plaintiff's claim on the ground that an attorney defendant's due process right to present a defense is compromised by the defendant's inability to present confidential information in support of that defense only in *the rarest of cases*, after the court has considered [several] factors . . . ." (*Id.* at p. 794, italics added; see *id.* at pp. 792–794 [enumerating pertinent factors].) In the present case, the attorney-defendants do not contend that such an evidentiary hearing has been held.

 Conspiracies are typically proved by circumstantial evidence. (See *People v. Bawden* (1962) 208 Cal.App.2d 589, 596–597 [25 Cal.Rptr. 368].) "[S]ince such participation, cooperation or unity of action is difficult to prove by direct evidence, it can be inferred from the nature of the act done, the relation of the parties, the interests of the alleged conspirators, and other circumstances." (*Black v. Sullivan* (1975) 48 Cal.App.3d 557, 566 [122 Cal.Rptr. 119].)

Section 1714.10 was intended to " ' "weed out" ' " *frivolous* attorney-client conspiracy claims, not to bar them all. (*Central Concrete Supply Co., Inc. v. Bursak, supra*, 182 Cal.App.4th at pp. 1098–1099; see *Evans v. Pillsbury, Madison & Sutro, supra*, 65 Cal.App.4th at p. 604.) Were we to agree with defendants that the attorney-client privilege bars this action, we may as well conclude that no attorney-client conspiracy claims are viable.

We therefore conclude the trial court properly granted plaintiffs' motion to amend the complaint to add the attorney-defendants as conspirators to the first three causes of action.

## III

## DISPOSITION

The order is affirmed.

Johnson, J., concurred.

**ROTHSCHILD, J.,** Dissenting.—The majority opinion directly conflicts with the leading Supreme Court precedent in this area, *Doctors' Co. v. Superior Court* (1989) 49 Cal.3d 39 [260 Cal.Rptr. 183, 775 P.2d 508] (*Doctors' Co.*). As a result, the majority opinion not only reaches the wrong result in this case but also introduces confusion and uncertainty into this area of the law. I therefore respectfully dissent.

In order to allege a legally valid claim for an attorney-client conspiracy under *Doctors' Co.*, plaintiffs must allege either (1) that the attorney-defendants acted "in furtherance of [their] own financial gain" (other than the earning of attorney fees) or (2) that the attorney-defendants violated their "own duty to the plaintiff[s]." (*Doctors' Co., supra*, 49 Cal.3d at pp. 46–47.) In contrast, if the attorney-defendants acted not for their own financial advantage but merely as agents of the neighbor-defendants, and if the attorney-defendants violated no duty they owed to plaintiffs (but rather assisted the neighbor-defendants in violating *their* duties), then the conspiracy claim fails as a matter of law. "A cause of action for civil conspiracy may not arise . . . if the alleged conspirator, though a participant in the agreement underlying the injury, was not personally bound by the duty violated by the wrongdoing and was acting only as the agent or employee of the party who did have that duty." (*Id.* at p. 44.)

In *Doctors' Co.*, the plaintiff alleged that the defendant insurer, the insurer's attorneys, and a medical expert had conspired to violate the insurer's statutory duty to attempt "to effectuate a prompt and fair settlement of a claim after liability has become reasonably clear." (*Doctors' Co., supra*, 49 Cal.3d at pp. 41–42, fn. omitted.) According to the complaint, the insurer, the attorneys, and the medical expert conspired to produce " 'a false medical opinion' " that gave the insurer " 'a plausible sounding excuse' " for rejecting settlement offers. (*Id.* at p. 43.) The court reasoned, however, that the statutory duty to attempt to settle applies only to " 'persons engaged in the business of insurance' " and therefore applied to neither the attorneys nor the expert. (*Id.* at p. 44, quoting Ins. Code, § 790.01.) Because the attorneys and the expert "were acting merely as agents of the insurer," they could not be "held liable for a conspiracy to violate a duty peculiar to the insurer." (49 Cal.3d at pp. 44–45.)

The case before us is not materially distinguishable. The judgment in plaintiffs' first action ordered Marvin Goodfriend alone to "abate the continuing nuisance in accordance with [plaintiffs' expert's] remediation plan." The duty to abate the nuisance is therefore "peculiar to" Marvin Goodfriend. (*Doctors' Co., supra*, 49 Cal.3d at p. 44.) His agents consequently cannot be "held liable for a conspiracy to violate" that duty (*ibid.*), regardless of whether those agents are lawyers or nonlawyers.

According to the majority, however, the attorney-defendants may be held liable for conspiring with the Goodfriends to violate "a duty not to engage in affirmative misconduct that would interfere with the remediation of the

contaminated debris." (Maj. opn., *ante*, at p. 1141.) For the reasons already given, it is impossible to reconcile that conclusion with *Doctors' Co.*[1]

The majority relies heavily upon *Burtscher v. Burtscher* (1994) 26 Cal.App.4th 720 [31 Cal.Rptr.2d 682] (*Burtscher*), a case that was probably wrongly decided. The *Burtscher* opinion never acknowledges that a legally valid attorney-client conspiracy claim *must* be based on either conduct in furtherance of the attorneys' own financial gain or conduct in violation of an independent duty that the attorneys owe to the plaintiffs. Without ever stating that legal standard, the *Burtscher* opinion nonetheless concludes that the plaintiffs in that case showed a reasonable probability of success on the merits. But never having acknowledged the applicable legal standard, the opinion fails to explain whether the attorneys were acting for their own financial gain or owed the plaintiffs an independent duty (or both). (See *id.* at pp. 726–727.) *Burtscher* therefore presents no doctrinally sound basis for its conclusion that the plaintiffs in that action succeeded in "mak[ing] out a prima facie case." (*Id.* at p. 726.) It is consequently a mistake to rely upon *Burtscher*.

The majority's conclusions concerning the attorney-defendants' "duty to disburse the funds from their trust account in a fair manner" fare no better. (Maj. opn., *ante*, at p. 1141.) Again, the judgment in plaintiffs' first action imposed on Marvin Goodfriend alone a duty to pay for the remediation of both properties in accordance with plaintiffs' expert's remediation plan. The attorney-defendants are not alleged to have done anything that interfered with Goodfriend's performance of that duty. And even if they were, such allegations would again show only that they assisted their client in violating his duties, not that they had violated an independent duty of their own.

I also disagree with the majority's analysis of the litigation privilege. But because we need not reach that issue if the conspiracy claim fails, I will address it only briefly.

The majority argues that *Rusheen v. Cohen* (2006) 37 Cal.4th 1048 [39 Cal.Rptr.3d 516, 128 P.3d 713] (*Rusheen*) is distinguishable because it applied the litigation privilege to postjudgment enforcement activities, but here defendants were obstructing rather than enforcing the judgment. (Maj. opn., *ante*, at pp. 1162–1163.) The difference between enforcement and obstruction, however, is often in the eye of the beholder. Remediation work that plaintiffs view as implementing the judgment might be viewed by defendants as beyond the judgment's scope, and conduct that defendants view

---

[1] *Doctors' Co.* cannot be distinguished on the basis of the majority's reference to "affirmative misconduct." There was "affirmative misconduct" in *Doctors' Co.* too, culminating in the production of " 'a false medical opinion.' " (*Doctors' Co., supra*, 49 Cal.3d at p. 43.)

as endeavoring to make sure the judgment is enforced strictly according to its terms might be viewed by plaintiffs as obstruction. The protection afforded by the litigation privilege is hollow if it can be defeated by a mere allegation that plaintiffs are right and defendants are wrong.

Finally, I must address the procedural posture of the case and the majority's treatment of the record. First, as the majority acknowledges, this is a pleading case, an appeal from an order granting a motion for leave to file an amended complaint. The trial court has not made any factual findings, and, a fortiori, no factual findings are being reviewed or affirmed by this court.

Second, the majority relies upon the policy of liberal construction of pleadings. (Maj. opn., *ante*, at p. 1141.) I believe that such an approach is inappropriate in a case like this one, involving claims for an attorney-client conspiracy. Civil Code section 1714.10 reflects a legislative judgment that attorney-client conspiracy claims are disfavored, given the obvious potential for abuse and disruption of attorney-client relationships. I would accordingly apply a more demanding standard of review to such pleadings, similar to the standard applied to fraud claims. (See *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 216 [197 Cal.Rptr. 783, 673 P.2d 660].)

Third and finally, even if I agreed that liberal construction of the pleadings were appropriate in attorney-client conspiracy cases, I would disagree with the majority's application of that standard here. Although the record before us is limited, a careful review of it indicates that there may be much less to plaintiffs' claims than the majority's liberal construction suggests. A few examples will serve to illustrate.

According to the complaint and documents attached thereto, the trial court ordered the attorney-defendants not to send e-mails to the remediation contractors without approval of either the court or plaintiffs, and the attorney-defendants violated that order. The record before us contains neither the remediation plan nor any of the unauthorized e-mails that were allegedly sent, so we know neither what the e-mails said nor whether the e-mails interfered in any way with the remediation. Moreover, the first amended complaint does not allege that the unauthorized e-mails interfered in any way with the remediation—rather, the pleading alleges only that the e-mails were unauthorized. But the majority, liberally construing the pleading, infers that the e-mails interfered. (See, e.g., maj. opn., *ante*, at p. 1155.)

The majority quotes Marvin Goodfriend's deposition as indicating that he refused to remove contaminated debris from plaintiffs' property unless ordered to do so by a court. (Maj. opn., *ante*, at p. 1142.) The deposition

excerpt submitted by plaintiffs themselves, however, shows that Goodfriend testified only that he would not remove certain "stone, concrete and tile" *from his own property* without a court order. There is no indication that the stone, concrete, and tile were contaminated.

The motion papers filed by plaintiffs and defendants indicate that both plaintiffs' and the neighbor-defendants' properties consist of an upper portion and a lower portion. It appears that the contaminated debris that was the subject of plaintiffs' first lawsuit (before Judge Sarmiento) was dumped on the *lower* portions of the properties. It further appears that plaintiffs' second lawsuit (before Judge Tarle) concerned a fence, oleanders, and certain other matters all located on the *upper* portion of the properties. The record before us contains none of Judge Tarle's orders, so it is impossible for us to confirm what those orders did or did not say. These circumstances do, however, cast the majority's long quote from Judge Sarmiento's phone call with attorney Stevens in a somewhat different light. (See maj. opn., *ante*, at pp. 1144–1146.) Stevens was apparently supervising or in some way involved in work relating to the oleanders and the fence (on the *upper* portion of the property). He claimed to believe that the work was consistent with Judge Tarle's orders. For all that the record before us reveals, that belief may have been not only reasonable but also correct—we have never seen those orders, and Judge Sarmiento does not appear to have seen them either (he said only that he had spoken with Judge Tarle on the phone).

The judgment in the first action directed Marvin Goodfriend to pay for the remediation of both properties. The judgment also provided that the cost was not to exceed the budget stated in the court-approved remediation plan. The first amended complaint alleges that the budget was $230,000. The first amended complaint also alleges that (1) the attorney-defendants "began accepting, holding, and disbursing the money to perform the remediation on *both* . . . properties into their [t]rust [a]ccount"; (2) defendants contended that "once the 'budget' of approximately $230,000 was exhausted, Goodfriend no longer had to perform the remediation"; (3) "dispute[s] arose pertaining to" the funds in the trust account, and the attorney-defendants "disbursed the funds" rather than obtaining plaintiffs' consent or filing an interpleader; and (4) "[o]ver $115,000 was paid out of that [t]rust [a]ccount." The majority, liberally construing the pleading, infers that "a fair share of the $115,000, if any, did not go toward remediating plaintiffs' property," reasoning that "[h]ad it been otherwise, plaintiffs would have noticed the partial remediation of their property and known about the disbursement." (Maj. opn., *ante*, at p. 1143.) The pleading, however, alleges none of those things. It does not allege that less than a fair share (whatever that might be; recall that we have never seen the remediation plan or budget) of the alleged $115,000 has been spent on remediation of plaintiffs' property. It does not allege that no remediation work has taken place on plaintiffs' property, and it does not

allege that all remediation work has been paid for in advance. Rather, according to the allegations of the complaint, some unspecified amount or amounts of funds were deposited into the trust account to pay for remediation work, some unspecified "disputes" arose as to some unspecified portion of those funds, the attorney-defendants "disbursed the funds" that were disputed without first obtaining plaintiffs' consent or filing an interpleader, and "[o]ver $115,000 was paid out of that [t]rust [a]ccount" for something or other. For all that the first amended complaint alleges, every penny of the alleged $115,000 may have been spent on remediation of plaintiffs' property. As I have already noted, the first amended complaint does not allege that the attorney-defendants have done anything that interfered with Marvin Goodfriend's performance of his obligation to pay for the remediation.

For these and other reasons, plaintiffs' portrait of themselves as innocent victims and of defendants as brazen scofflaws deserves careful scrutiny. The majority's liberal construction of the pleading conceals these issues and embellishes plaintiffs' allegations in a manner that, in my view, extends well beyond the limits of reasonable inference.

I respectfully dissent.

A petition for a rehearing was denied February 5, 2013, and the petition of appellants James N. Procter and Daniel R. Stevens for review by the Supreme Court was denied April 10, 2013, S208872.